PROFESSIONAL RECRUITERS, INC., APPELLANT, V. JAMES H. OLIVER ET AL., APPELLEES.

456 N.W.2d 103

Filed June 1, 1990.   No. 88-443.

Daniel W. Ryberg for appellant.

Kenneth C. Fritzler, of Ross, Schroeder & Fritzler, for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

This is an appeal from a judgment of the district court for Hall County for the defendants, dismissing the plaintiff's petition. We reverse the judgment and remand for a new trial on damages only.

This matter has previously been before this court. In *Professional Recruiters v. Oliver*, 226 Neb. 16, 409 N.W.2d 304 (1987), we reversed and remanded for a new trial after we determined the trial court erroneously instructed the jury that personal services contracts are governed by the Nebraska Uniform Commercial Code statute of frauds.

On retrial, a jury was waived and the parties submitted for the court's consideration the record from the previous trial. The evidence shows the plaintiff, Professional Recruiters, Inc., is an employer-paid professional search firm. On December 2, 1983, Barbara Connelly, an employee of Professional Recruiters, contacted Larry McMaster regarding a possible opening at a bank other than the banks which are parties to this action. McMaster expressed his interest in that opening. At that time McMaster was working for a bank in Wisner, Nebraska. On December 8, Connelly contacted George Wanitschke of the Bank of Doniphan, Inc. (Doniphan), inquiring as to whether his bank had an opening for a bank officer. Wanitschke is Doniphan's president. He indicated he was looking for someone to fill an officer position. Connelly forwarded Wanitschke a copy of Professional Recruiters' service agreement, including a fee structure; a company brochure; the candidate's resume; and a candidate referral sheet. Wanitschke acknowledged receipt of these materials and testified that based on the fee schedule, Doniphan would owe Professional Recruiters $9,000 if McMaster was hired. However, Wanitschke testified he was not willing to pay that amount and the proper amount would need to be negotiated.

On December 20, Wanitschke interviewed McMaster for the

position at Doniphan, but also wanted James H. Oliver, the chairman of Doniphan's board of directors, to interview McMaster. Oliver is also on the board of directors of The Ravenna Bank, Inc. (Ravenna). McMaster and Oliver met for a second interview on January 6, 1984. At that meeting Oliver mentioned to McMaster that Ravenna's executive vice president had resigned the day before and therefore that position might be available. Oliver testified that he did not urge McMaster to select one position over the other. McMaster acknowledged that Oliver mentioned the Ravenna opening at this meeting, but that Oliver did not encourage him to accept or interview at Ravenna.

Oliver phoned Dale Pohlmann, Ravenna's president, and asked him if he would like to meet with McMaster that afternoon. McMaster traveled to Ravenna later that day and had an informal interview with Pohlmann. Neither McMaster nor Oliver indicated to Pohlmann that McMaster was involved with Professional Recruiters. McMaster was hired by Ravenna on January 25 and began work on or about February 13. Professional Recruiters sent Pohlmann a statement for $9,000 for their services. Pohlmann testified that this was the first time he became aware of Professional Recruiters' involvement. Ravenna, Doniphan, and Oliver refused to pay Professional Recruiters for its services, maintaining that none of them had an agreement with Professional Recruiters.

Professional Recruiters brought suit in the Hall County District Court against Oliver, Ravenna, and Doniphan. The second amended petition alleged fraudulent inducement, interference with business relationship or, alternatively, unjust enrichment, and misappropriation of confidential information. The defendants' answer denied the existence of any contract, oral or written. On remand the case was tried by the court without a jury. The trial court rendered a general verdict for the defendants and dismissed Professional Recruiters' petition. Professional Recruiters has appealed to this court, contending that the verdict is contrary to law and fact.

Initially, defendants argue that this court's standard of review is limited. They contend that because Professional Recruiters did not file a motion for new trial as required by

Neb. Rev. Stat. § 25-1142 (Reissue 1989), this court can only review the record to determine whether the judgment is supported by the pleadings. Defendants rely principally on *Sempek v. Sempek*, 198 Neb. 300, 252 N.W.2d 284 (1977), and *Nebraska State Bank v. Dudley*, 203 Neb. 226, 229, 278 N.W.2d 334, 336 (1979), where we stated, "In a law action where no motion for new trial is filed, this court on appeal will examine the record only for the purpose of determining whether or not the judgment is supported by the pleadings." Defendants argue that their answer to the second amended petition, considered as a pleading, constitutes a complete defense to Professional Recruiters' second amended petition, and therefore fully supports the judgment of the trial court.

This contention is without merit. Neb. Rev. Stat. § 25-1912.01(1) (Reissue 1989) was enacted subsequent to the cases relied upon by defendants. This section provides: "A motion for a new trial shall not be a prerequisite to obtaining appellate review of any issue upon which the ruling of the trial court appears in the record." In light of this section, the cases relied upon by defendants are of questionable continuing validity. Professional Recruiters' failure to file a motion for new trial does not limit this court's review in this case.

This court has often stated that the factual findings of the trial court in a law action tried without a jury have the effect of findings of a jury and will not be set aside unless they are clearly wrong. *Marvin E. Jewell & Co. v. Thomas*, 231 Neb. 1, 434 N.W.2d 532 (1989).

In its second amended petition Professional Recruiters alleged that the defendants were unjustly enriched when Ravenna hired McMaster but refused to pay Professional Recruiters for its services. "The doctrine of quasi-contracts has been supplanted in modern times by the doctrines of 'unjust enrichment' and 'restitution,' but, in essence, is the same." *Siebler Heating & Air Conditioning v. Jenson*, 212 Neb. 830, 833, 326 N.W.2d 182, 184 (1982). Although Doniphan's demurrer was sustained with respect to this cause of action, it remains viable as to Oliver and Ravenna.

Under the unjust enrichment cause of action in its second amended petition, Professional Recruiters incorporated by

reference 11 paragraphs set forth under the "fraudulent inducement" cause of action. These paragraphs, in sum, alleged the existence of an express agreement between Professional Recruiters and the defendants. Professional Recruiters' petition therefore alleged express and quasi-contract theories of recovery.

In *Siebler Heating & Air Conditioning v. Jenson, supra*, the plaintiff brought suit against defendant to recover upon an express contract ostensibly made between plaintiff and a company owned in part by defendant. Plaintiff did not allege quasi-contract as a theory of recovery. Both the plaintiff and the defendant agreed that a contract existed, but disputed with whom the contract was made. The trial court dismissed the petition. On appeal plaintiff argued for the first time that a quasi-contract existed between plaintiff and the named defendant. We refused to find such a contract, stating, "Having pled and proved the existence of an express contract to pay a specific amount based upon time and material [plaintiff] is precluded from now seeking to have the court, on appeal, create a quasi-contract in lieu of the express contract upon which recovery was originally sought." *Id*. at 833, 326 N.W.2d at 184. We further stated, "We likewise believe that one may not plead an express contract and then, as here, over objection of [defendant], seek to prove at trial or argue on appeal for the creation of a quasi-contract." *Id*. at 834, 326 N.W.2d at 184-85.

In *Associated Wrecking v. Wiekhorst Bros.*, 228 Neb. 764, 424 N.W.2d 343 (1988), plaintiff brought suit against defendant, alleging the existence of an express contract and, in addition, alleging grounds for recovery based on a theory of quantum meruit for "extra work" not covered by the express contract. The trial court found in favor of plaintiff on both theories. On appeal the defendant argued that "a party cannot plead an express contract and then prove and recover on quantum meruit, because an express contract precludes the existence of a contract implied by law or a quasi-contract." 228 Neb. at 768, 424 N.W.2d at 347. We acknowledged that, unlike in *Siebler*, plaintiff added a quantum meruit theory "to *supplement* an express contract theory, not to act as a *substitute* for it." 228 Neb. at 769, 424 N.W.2d at 348. We stated:

The central issue then becomes whether the alleged "extra work" was encompassed in the plaintiff's cause of action for the balance claimed due under the contract it had allegedly substantially performed. For if the extra work was required by the contract, the plaintiff cannot seek to be compensated under the idea of quantum meruit. *Id*. at 770, 424 N.W.2d at 348. We held that "an implied contract on a point not covered by an express contract is not superseded by the express contract, and if [both] arise out of the same transaction, they may be pleaded and tried together." *Id*. at 772, 424 N.W.2d at 350. The evil sought to be avoided in *Associated Wrecking* was permitting a plaintiff to recover damages under a quasi-contract theory when those same damages were recovered under an express contract theory. The plaintiff in *Associated Wrecking* could therefore recover on both theories because the subject matter of both contracts was different.

The petition in the present case alleged both express contract and quasi-contract theories. The trial court rendered a general verdict for defendants, implicitly finding that no express contract existed. We agree that no express contract exists between Professional Recruiters and the defendants. As we stated in *Zimmerman v. Martindale*, 221 Neb. 344, 347-48, 377 N.W.2d 94, 97 (1985):

> "To establish an express contract, there must be shown what amounts to a definite proposal and an unconditional and absolute acceptance thereof. [Citations omitted.]
>
> Further, in order that a binding contract may result from an offer and acceptance, it is essential that the minds of the parties meet at every point, and that nothing be left open for a future arrangement."

The evidence established that the defendants did not unconditionally accept Professional Recruiters' offer. Wanitschke did not agree on the price to be paid to Professional Recruiters if McMaster was hired, and, further, all the defendants have consistently maintained that they never contracted with Professional Recruiters. This case is therefore distinguishable from *Siebler* because Professional Recruiters failed at trial to prove an express contract, but has alleged a

quasi-contract theory of recovery and has presented it to the trial court. Therefore, Professional Recruiters is *not* "precluded from now seeking to have the court, on appeal, create a quasi-contract in lieu of the express contract upon which recovery was originally sought." This case is also distinguishable from *Associated Wrecking,* in that there is no express contract; therefore, the reasonable value of Professional Recruiters' services sought to be recovered under the quasi-contract theory has not been recovered in whole or in part under the express contract theory.

In its second amended petition Professional Recruiters alleged unjust enrichment, or quasi-contract, in the alternative to its express contract theory. A plaintiff is permitted to plead both express contract and quasi-contract in the same petition. As we stated in *Associated Wrecking, supra* at 770-71, 424 N.W.2d at 349:

> Although this court has not specifically dealt with "extra work," Nebraska clearly recognizes cases based on causes of action on both a quantum meruit theory and an express contract. In the case of *Vantage Enterprises, Inc. v. Caldwell,* 196 Neb. 671, 244 N.W.2d 678 (1976), we endorsed the practice of joining the two theories of recovery in a single petition. As authority for the proposition that Vantage should have joined its two theories in its original petition, we illustrated that "[s]ection 25-701, R.R.S. 1943, specifically provides: 'The plaintiff may unite several causes of action in the same petition, whether they be such as have heretofore been denominated legal or equitable, or both, when they are included in any of the following classes: (1) The same transaction or transactions connected with the same subject of action; (2) contracts, express or implied; * * *.' This court has consistently held that an action in quantum meruit may be joined in a petition with an action on an express contract, and a judgment based on either will satisfy the liability as to both claims where they have their origin in the same transaction. Rodgers v. Jorgensen, 159 Neb. 485, 67 N.W.2d 770 (1954); Umberger v. Sankey, 154 Neb. 881, 50 N.W.2d 346 (1951); Stout v. Omaha, L. & B.

Ry. Co., 97 Neb. 816, 151 N.W. 295 (1915)." 196 Neb. at 674, 244 N.W.2d at 680.

Although the *Vantage* holding concerned the application of the doctrine of res judicata to the use of the two theories in two separate lawsuits, the basis of the ruling was that where the facts arise out of the same transaction, an action on an express contract may be joined with an action for quantum meruit. See, also, *Tobin v. Flynn & Larsen Implement Co.*, 220 Neb. 259, 369 N.W.2d 96 (1985).

It remains to be determined whether the trial court erred in failing to find that Ravenna and Oliver were unjustly enriched. In *McIntosh v. Borchers*, 201 Neb. 35, 37-38, 266 N.W.2d 200, 203 (1978), this court stated that

[c]auses of action relying on principles of unjust enrichment and quasi-contract do exist in this state. Ladenburger v. Platte Valley Bank of North Bend, 180 Neb. 167, 141 N. W. 2d 766 (1966); Bush v. Kramer, 185 Neb. 1, 173 N. W. 2d 367 (1969); Clark & Enersen, Hamersky, S., B. & T., Inc. v. Schimmel Hotels Corp., 194 Neb. 810, 235 N. W. 2d 870 (1975).

" 'A quasi contract is a contract implied in law and usually has its origin in the principle that a person shall not be allowed to enrich himself unjustly at the expense of another.' " *Haggard Drilling, Inc. v. Greene*, 195 Neb. 136, 142, 236 N.W.2d 841, 845 (1975). We stated in *Hoffman v. Reinke Mfg. Co.*, 227 Neb. 66, 69, 416 N.W.2d 216, 219 (1987), "It has been said that where benefits have been received and retained under such circumstances that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor, the law requires the party receiving and retaining the benefits to pay their reasonable value."

In the present case, Oliver testified that he learned through Wanitschke that McMaster was available for hiring. Oliver testified his "first real confirmed knowledge" of Professional Recruiters' involvement came around January 21. McMaster was hired on January 25. He also testified, on cross-examination, that he is familiar with employment agencies such as Professional Recruiters, that he was aware

these agencies are employer-paid agencies, and that these fees are usually based on a percentage of the candidate's first year's salary, should the candidate be hired.

Likewise, Pohlmann, Ravenna's president, contends he was not aware Professional Recruiters expected a fee until after McMaster was hired. He testified that he learned through Oliver on January 6 that McMaster was available for employment. After the initial interview on January 6, Oliver contacted Pohlmann and suggested that " 'the gray hair [McMaster] might fit on your staff.' " Pohlmann took this as a subtle positive encouragement. Pohlmann testified that he was somewhat familiar with employer-paid search agencies.

Connelly testified that, after the January 6 interview, she made several phone calls to Oliver to inquire about the status of McMaster and to explain the search firm's nature. She was able to speak with Oliver on January 9. In that call she identified herself, identified the firm, and began to ask about McMaster and Ravenna, but was "abruptly cut off." Oliver acknowledged receiving this call, but explained that he abruptly ended the conversation because it was a "nuisance" call. Connelly also testified that she called Pohlmann twice and spoke with him January 12. In this call she again identified herself, identified the firm, and began to ask about McMaster and the Ravenna interview. Pohlmann interrupted and referred her to Oliver, ending the conversation. Pohlmann acknowledged the call and acknowledged referring Connelly to Oliver.

Although it appears that by Connelly's phone calls Pohlmann may have had independent actual knowledge of Professional Recruiters' involvement prior to hiring McMaster, the evidence is clear Oliver had actual knowledge of its involvement prior to the time McMaster was hired. Oliver is on Ravenna's board of directors, and as a director he receives as monthly compensation $3,000. We also note Ravenna is owned by a holding company, which in turn is also majority owned by Oliver and his family. As a director, Oliver's actual knowledge of Professional Recruiters' involvement is imputed to Ravenna. See, *Federal Sav. and Loan Ins. Corp. v. Morque*, 372 N.W.2d 872 (N.D. 1985) (knowledge of the board of directors, officers, or agents of a corporation is imputed to the corporation); *Regal*

*Ins. Co. v. Summit Guar. Corp.*, 324 N.W.2d 697 (Iowa 1982) (generally, knowledge or notice of an officer-director of a corporation is imputed to the corporate entity even if it is never actually disclosed to the corporation); 10 Am. Jur. 2d *Banks* § 163 (1963) (where a director or officer has knowledge of material facts respecting a proposed transaction, which his relations to it as representing the bank have given him, it becomes his official duty to communicate that knowledge to the bank, and he will be presumed to have done so and his knowledge will be imputed to the bank, and this presumption cannot be rebutted by showing that the knowledge of such facts was not actually transmitted to the bank). Oliver's and Pohlmann's knowledge regarding the nature of employer-paid search firms would also be imputed to Ravenna.

Oliver, and therefore Ravenna, was aware of Professional Recruiters' involvement with McMaster. Oliver and Ravenna were also aware of the nature of professional search firms like Professional Recruiters. Both parties therefore knew or should have known that Professional Recruiters expected a fee if McMaster was hired. Moreover, Professional Recruiters conferred a benefit upon Oliver and Ravenna by providing McMaster's name to be considered for a vacant position which was eventually filled by McMaster. Both Oliver and Pohlmann admitted at trial that Ravenna decided to employ McMaster and retain the benefit of that employment. Under these circumstances it would be unjust and inequitable to allow Oliver and Ravenna to retain the benefit of McMaster's employment without paying Professional Recruiters the reasonable value of its services in providing McMaster's name. The trial court therefore erred as a matter of law in failing to find that Oliver and Ravenna were unjustly enriched.

Because of our ruling on this issue, it is unnecessary to consider the remaining causes of action. We cannot say with certainty that $9,000 is the reasonable value of Professional Recruiters' services. That amount appears to be in dispute. Accordingly, the judgment is reversed and the cause is remanded for a new trial on damages only.

REVERSED AND REMANDED FOR A NEW TRIAL ON THE ISSUE OF DAMAGES.